UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES GOULD, Derivatively on Behalf of NAVISTAR INTERNATIONAL CORPORATION, | ) ) ) | No. |
| | ) | |
| Plaintiff, | ) ) | |
| | ) | |
| v. | ) ) | |
| ANDREW J. CEDEROTH, JOHN D. CORRENTI, MICHAEL N. HAMMES, JAMES H. KEYES, DENNIS D. WILLIAMS, DANIEL C. USTIAN, STANLEY A. MCCHRYSTAL, DAVID D. HARRISON, STEVEN J. KLINGER, EUGENIO CLARIOND, DIANE H. GULYAS, and WILLIAM H. OSBORNE, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| – and – | ) ) | |
| NAVISTAR INTERNATIONAL CORPORATION, a Delaware corporation, | ) ) ) | DEMAND FOR JURY TRIAL |
| Nominal Defendant. | ) ) ) | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH
OF FIDUCIARY DUTY, CORPORATE WASTE, AND UNJUST ENRICHMENT**

# TABLE OF CONTENTS

Page

I.    NATURE AND SUMMARY OF THE ACTION ............................................................1

II.    JURISDICTION AND VENUE ...............................................................................3

     A.     Plaintiff ............................................................................................4

     B.     Nominal Defendant...........................................................................4

     C.     Individual Defendants.......................................................................4

III.    DUTIES OF THE INDIVIDUAL DEFENDANTS .......................................................10

     A.     Fiduciary Duties..............................................................................10

     B.     Breaches Of Duties .........................................................................11

     C.     Additional Duties of the Audit Committee Defendants........................12

IV.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ...............13

V.    THE COMPANY FAILS TO COMPLY WITH EPA STANDARDS.............................15

VI.    THE INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING STATEMENTS.........................................................................................................16

VII.    REASONS THE STATEMENTS WERE IMPROPER ..................................................34

VIII.    THE TRUTH EMERGES.........................................................................................35

IX.    THE IMPROPER REPURCHASES.............................................................................36

X.    DAMAGES TO COMPANY NAME...........................................................................38

XI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ......................................39

     A.     Demand Is Excused Because Defendants Correnti, Harrison, Keyes, William, and Klinger Face a Substantial Likelihood of Liability for Their Misconduct..............................................................................40

XII.    FIRST CAUSE OF ACTION ...................................................................................42

XIII.    SECOND CAUSE OF ACTION ...............................................................................44

XIV.    THIRD CAUSE OF ACTION ...................................................................................45

XV.    PRAYER FOR RELIEF ................................................................................................45

XVI.   JURY DEMAND ..........................................................................................................46

## I.     NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action by plaintiff James Gould on behalf of nominal defendant Navistar International Corporation ("Navistar" or the "Company") against certain of its current and former officers and directors for breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.   These wrongs resulted in damage to Navistar's reputation, goodwill, and standing in the business community.   Moreover, the Individual Defendants (as defined herein) have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.     Navistar is a holding company, which, through its subsidiaries, manufactures and sells commercial and military trucks, buses, diesel engines, recreational vehicles ("RVs"), and chassis, as well as provides service parts for trucks and trailers.   It operates in four segments: Truck, Engine, Parts, and Financial Services.

3.     As detailed herein, the Individual Defendants are responsible for the Company's blatant failure to abide by U.S. governmental environmental regulations.   This failure to follow governmental regulation subjected the Company to significant fines and penalties.   In addition, the Individual Defendants caused or allowed the Company to issue materially false and misleading statements concerning the Company's financial condition and future business prospects, including misrepresentations and omissions of material facts concerning Navistar's financial disclosures in filings with the U.S. Securities and Exchange Commission ("SEC").

4.     In 2001, the U.S. Environmental Protection Agency ("EPA") drafted new, strict regulations on trucks that were set to go into effect in 2010 (the "2010 EPA Standards").   In particular, among other things, the 2010 EPA Standards stated that no heavy-duty diesel engine could emit levels of nitrogen oxides ("NOx") higher than 0.20 g/bhp-hr (grams per brake horsepower-hour).   At that time, there were two primary engine technologies: (1) Exhaust Gas Recirculation ("EGR"), which reduced emissions by burning off exhaust pollutants within the engine (*i.e.* "in-cylinder"); and (2) Selective Catalytic Reduction ("SCR"), which reduced emissions by treating the engine exhaust with a urea-based chemical after it left the engine.   EGR

was the method preferred by customers for convenience and cost factors. Nonetheless, it quickly became clear that SCR was the only viable option to reach the 0.20g NOx. In fact, every single one of Navistar's competitors had adopted SCR and received EPA certification by the end of 2010.

5.      Despite clear indications that EGR was not a viable method to achieve 0.20g NOx, the Individual Defendants repeatedly claimed that Navistar could develop an EGR engine that would be certified by the EPA. In fact, although Navistar invested approximately $700 million on developing its proprietary Advanced EGR engine (the "Advanced EGR engine"), it was later revealed that the Company had not even applied for certification of the EPA emissions standard (0.20g NOx) until early 2011, *one year after the 2010 EPA Standards had become effective*. Instead, to keep selling trucks and to stay in business, Navistar began using EPA credits it had previously earned. Once the credits ran out, the Company then started paying a non-compliance fine for each truck it sold. Navistar was increasingly facing technological, legal, and liquidity issues which threatened its business.

6.      To conceal this fact from Navistar's investors and customers, the Individual Defendants repeatedly stated that Navistar had indeed achieved an engineering milestone and had an EPA-compliant EGR engine ready to be certified. For example, in November 2010, defendant Daniel C. Ustian ("Ustian"), the Company's President and Chief Executive Officer ("CEO"), falsely stated "*[w]e're 100% there in terms of our ability to [achieve 0.20 NOx]*...." Similar remarks were made by defendant Ustain and other Individual Defendants throughout the rest of 2010 and all of 2011.

7.      In July 2012, Navistar shocked the market when the Company admitted its failure to achieve an EPA-compliant EGR engine. The Company further announced that it was abandoning its attempts to create viable EGR technology and adopting its competitors SCR technology in order to remain in business.

8.      Shortly thereafter, on August 2, 2012, Navistar issued a press release entitled "Navistar Announces Actions Designed to Enhance Competitive Position, Drive Profitable

- 2 -

Growth and Increase Shareholder Value." The Company disclosed that it was withdrawing its full-year fiscal 2012 guidance until releasing its third fiscal quarter 2012 results. Further, the Company disclosed that it received a formal letter of inquiry from the SEC involving an investigation of various accounting and disclosure matters dating back to November 2010 by the SEC.

9. As a result of this announcement, Navistar's market capitalization dropped dramatically, falling 70% from its relevant period high of more than $5 billion to less than $1.5 billion. To make matters worse, prior to the drop, certain of the Individual Defendants authorized the Company to repurchase almost $200 million worth of its own stock that was artificially inflated by approximately $93 million.

10. Further, as a direct result of this unlawful course of conduct, the Company is now the subject of at least one federal securities class action lawsuit filed in the United States District Court for the Northern District of Illinois on behalf of investors who purchased Navistar's shares.

## II.    JURISDICTION AND VENUE

11. This Court has jurisdiction under 28 U.S.C. §1332 because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

12. This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13. Venue is proper under 28 U.S.C. §1391(a) because Navistar maintains offices within this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

- 3 -

**A.      Plaintiff**

14.      Plaintiff James Gould was a shareholder of Navistar at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Navistar shareholder.  Plaintiff is a citizen of New York.

**B.      Nominal Defendant**

15.      Nominal Defendant Navistar is a Delaware corporation with principal executive offices located at 2701 Navistar Drive, Lisle, Illinois.  Navistar is a holding company whose principal operating subsidiaries are Navistar, Inc. and Navistar Financial Corporation.  Navistar is an international manufacturer of International brand commercial and military trucks, IC Bus brand buses, MaxxForce brand diesel engines, and RVs under the Monaco family of brands, as well as a provider of service parts for all makes of trucks and trailers. Additionally, the Company is a private-label designer and manufacturer of diesel engines for the pickup truck, van, and sport-utility vehicle markets, and provides retail, wholesale, and lease financing of its trucks and parts.  Navistar's core business is the North American truck and bus market, where it participates primarily in the Class 4 through 8 vehicle market segments.

**C.      Individual Defendants**

16.      Defendant Andrew J. Cederoth ("Cederoth") is Navistar and Navistar Inc.'s Executive Vice President and Chief Financial Officer ("CFO") and has been since September 2009 and a Navistar, Inc. director and has been since April 2009.  Defendant Cederoth was also Navistar's interim principal financial officer from June 2009 to September 2009 and Senior Vice President, Corporate Finance from April 2009 to September 2009; Navistar, Inc.'s Vice President and CFO, Engine Division from 2006 to April 2009; and Navistar Financial Corporation's Vice President and Treasurer from 2001 to 2005.  Defendant Cederoth is named as a defendant in a securities class action complaint that alleges he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  Defendant Cederoth knowingly, recklessly, or with gross negligence caused or permitted the Company's failure to comply with EPA regulations.   In addition, Cederoth made improper statements concerning the Company's

development and approval of the Company's Advanced EGR engine.  Navistar paid defendant Cederoth the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value & Non-Qualified Deferred Compensation | All Other Compensation | Total |
|------|--------|-------------|---------------|------------------------------------------|---------------------------------------------------------------|-------------------------|-------|
| 2012 | $564,750 | $142,325 | $480,940 | - | $597,094 | $94,832 | $1,879,941 |
| 2011 | $513,500 | $1,079,641 | $926,796 | $372,416 | $34,635 | $220,525 | $3,147,513 |

Defendant Cederoth is a citizen of Illinois.

17. Defendant John D. Correnti ("Correnti") is a Navistar director and has been since 1994.  Defendant Correnti is also a member of Navistar's Audit Committee and has been since at least January 2010.  Defendant Correnti knowingly or recklessly caused or permitted the Company's failure to comply with EPA regulations and make improper statements concerning the Company's development and approval of the Company's Advanced EGR engine.  He also failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.  Navistar paid defendant Correnti the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|-------------|-------------------|--------------|---------------|-------|
| 2012 | $158,312 | $16,055 | $87,500 | $261,867 |
| 2011 | $121,875 | $19,125 | $105,600 | $246,600 |

Defendant Correnti is a citizen of Missouri.

18. Defendant Michael N. Hammes ("Hammes") is a Navistar's lead director and has been since December 2007 and a director and has been since 1996.  Defendant Hammes knowingly or recklessly caused or permitted the Company's failure to comply with EPA regulations and make improper statements concerning the Company's development and approval of the Company's Advanced EGR engine.  He also failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.  Navistar paid defendant Hammes the following compensation as a director

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2012 | $378,819 | $19,972 | $87,500 | $486,291 |
| 2011 | $154,553 | $14,947 | $105,600 | $275,100 |

Defendant Hammes is a citizen of California.

19.     Defendant James H. Keyes ("Keyes") is a Navistar director and has been since 2002.  Defendant Keyes is also Chairman of Navistar's Audit Committee and has been since at least January 2010.   Defendant Keyes knowingly or recklessly caused or permitted the Company's failure to comply with EPA regulations and make improper statements concerning the Company's development and approval of the Company's Advanced EGR engine.  He also failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.  The Company paid Keyes the following compensation as a director"

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2012 | $295,069 | $19,972 | $87,500 | $402,541 |
| 2011 | $131,053 | $14,947 | $105,600 | $251,600 |

Defendant Keyes is a citizen of South Carolina.

20.     Defendant Dennis D. Williams ("Williams") is a Navistar director and has been since 2006.  Defendant Williams is also a member of Navistar's Audit Committee and has been since December 2012.  Defendant Williams knowingly or recklessly caused or permitted the Company's failure to comply with EPA regulations and make improper statements concerning the Company's development and approval of the Company's Advanced EGR engine.  He also failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.   Navistar paid defendant Williams the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|
| 2012 | $117,870 | $117,870 |
| 2011 | $98,000 | $98,000 |

Defendant Williams is a citizen of Illinois.

21.     Defendant Daniel C. Ustian ("Ustian") was Navistar and Navistar, Inc.'s President and Chief Executive Officer from at least 2003 to August 2012; Chairman of the Board of Directors (the "Board") from 2004 to August 2012; and a director from 2002 to August 2012. Defendant Ustian was also Navistar, Inc.'s President and Chief Operating Officer from 2002 to 2003; President of the Engine Group of Navistar, Inc. from 1999 to 2002; and Group Vice President and General Manager of the Engine & Foundry Group of Navistar, Inc. from 1993 to 1999. Defendant Ustain knowingly or recklessly caused or permitted the Company's failure to comply with EPA regulations and make improper statements concerning the Company's development and approval of the Company's Advanced EGR engine. He also failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures. In addition, defendant Ustain made improper statements concerning the Company's development and approval of the Company's Advanced EGR engine. Defendant Ustian is named as a defendant in a securities class action complaint that alleges he violated Sections 10(b) and 20(a) of the Exchange Act. Navistar paid defendant Ustian the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value & Non-Qualified Deferred Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|--------------------------------------------------------------|------------------------|-------|
| 2012 | $1,068,333 | $446,472 | $2,383,940 | - | $3,990,164 | $8,209,696 | $16,098,605 |
| 2011 | $1,238,333 | $4,671,420 | $4,996,330 | $1,450,000 | $2,717,837 | $93,835 | $15,167,755 |

Defendant Ustian is a citizen of Illinois.

22.     Defendant Stanley A. McChrystal ("McChrystal") is a Navistar director and has been since February 2011. Defendant McChrystal knowingly or recklessly caused or permitted the Company's failure to comply with EPA regulations and make improper statements concerning the Company's development and approval of the Company's Advanced EGR engine. He also failed to implement adequate internal controls and procedures to ensure the accuracy of

the Company's disclosures. Navistar paid defendant McChrystal the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2012 | $31,261 | $100,109 | $87,500 | $218,870 |
| 2011 | $63,526 | $7,474 | - | $71,000 |

Defendant McChrystal is a citizen of Virginia.

23.     Defendant David D. Harrison ("Harrison") was a Navistar director from 2007 to October 2012. Defendant Harrison was also a member of Navistar's Audit Committee from at least January 2010 to October 2012. Defendant Harrison knowingly or recklessly caused or permitted the Company's failure to comply with EPA regulations and make improper statements concerning the Company's development and approval of the Company's Advanced EGR engine. He also failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures. Navistar paid defendant Harrison the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2012 | $83,649 | $34,000 | $87,500 | $205,149 |
| 2011 | $107,000 | $15,000 | $105,600 | $227,600 |

Defendant Harrison is a citizen of North Carolina.

24.     Defendant Steven J. Klinger ("Klinger") was a Navistar director from 2008 to October 2012. Defendant Klinger was also a member of Navistar's Audit Committee from at least January 2010 to October 2012. Defendant Klinger knowingly or recklessly caused or permitted the Company's failure to comply with EPA regulations and make improper statements concerning the Company's development and approval of the Company's Advanced EGR engine. He also failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures. Navistar paid defendant Klinger the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2012 | $95,395 | $19,972 | $87,500 | $202,867 |

| | 2011 | $107,053 | $14,947 | $105,600 | $227,600 |
| --- | --- | --- | --- | --- | --- |

Defendant Klinger is a citizen of Georgia.

25.    Defendant Eugenio Clariond ("Clariond") was a Navistar director from 2002 to October 2012.  Defendant Clariond knowingly or recklessly caused or permitted the Company's failure to comply with EPA regulations and make improper statements concerning the Company's development and approval of the Company's Advanced EGR engine.  He also failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.  Navistar paid defendant Clariond the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
| --- | --- | --- | --- | --- |
| 2012 | $2,609 | $110,761 | $87,500 | $200,870 |
| 2011 | - | $117,500 | $105,600 | $223,100 |

Defendant Clariond is a citizen of Mexico.

26.    Defendant Diane H. Gulyas ("Gulyas") was a Navistar director from 2009 to December 2012.  Defendant Gulyas knowingly or recklessly caused or permitted the Company's failure to comply with EPA regulations and make improper statements concerning the Company's development and approval of the Company's Advanced EGR engine.  She also failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.  Navistar paid defendant Clariond the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
| --- | --- | --- | --- | --- |
| 2012 | $99,398 | $19,972 | $87,500 | $206,870 |
| 2011 | $93,553 | $14,947 | $105,600 | $214,100 |

Defendant Gulyas is a citizen of Pennsylvania.

27.    Defendant William H. Osborne ("Osborne") was a Navistar director from 2009 to April 2011.  Defendant Osborne was also Navistar, Inc.'s Vice President, Custom Products in at least April 2011.   Defendant Osborne knowingly or recklessly caused or permitted the Company's failure to comply with EPA regulations and make improper statements concerning the Company's development and approval of the Company's Advanced EGR engine.  He also failed to implement adequate internal controls and procedures to ensure the accuracy of the

Company's disclosures. Navistar paid defendant Osborne the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $43,828 | $14,947 | $105,600 | $164,375 |

Defendant Osborne is a citizen of Michigan.

28.     The defendants identified in ¶¶16, 21 are referred to herein as the "Officer Defendants."   The defendants identified in ¶¶16-27 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶17, 19-20, 23-24 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶16-27 are referred to herein as the "Individual Defendants."

## III.    DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.    Fiduciary Duties

29.     By reason of their positions as officers, directors, and/or fiduciaries of Navistar and because of their ability to control the business and corporate affairs of Navistar, the Individual Defendants owed and owe Navistar and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Navistar in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Navistar and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

30.     To discharge their duties, the officers and directors of Navistar were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Navistar were required to, among other things:

(a)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(b)    ensure that the Company complied with its legal obligations and requirements, including complying with regulatory requirements and disseminating truthful and accurate statements to the investing public;

(c)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)    remain informed as to how Navistar conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

31.    Each officer and director of the Company owes to Navistar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**B.    Breaches Of Duties**

32.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Navistar, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a

risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of Navistar's Board.

33. The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to fail to comply with EPA guidelines in truck manufacturing, and then falsely represent that it designed engines capable of complying with regulations. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of the defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of securities laws. As a result, Navistar has expended, and will continue to expend, significant sums of money

34. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Navistar, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

### C. Additional Duties of the Audit Committee Defendants

35. In addition to these duties, under the Company's Audit Committee Charter in effect since at least 2004, the Audit Committee Defendants Correnti, Harrison, Keyes, Klinger, and Williams owed specific duties to Navistar to review and approve the Company's earnings press releases, guidance, and quarterly and annual financial statements. The Audit Committee's Charter provides in relevant part:

[T]he Audit Committee shall have the following authority and responsibilities:

1. Review and discuss with management and the independent auditor, the Corporation's annual audited financial statements, quarterly financial statements, and all internal control reports (or summaries thereof) and recommend to the Board the inclusion of the Corporation's audited financial statements in the Corporation's annual report on Form 10-K. The review shall include consideration of the application of the Corporation's accounting principles and their impact on the quality of its financial reporting.

2. Review and discuss with management and the independent auditor the Corporation's Form 10-Qs prior to filing the reports with the SEC.

3. Discuss with management and the independent auditor, as appropriate, corporate policies with respect to earnings press releases, as well as financial information and earnings guidance provided to analysts and to rating agencies. This discussion would include the type of information to be disclosed and type of presentation to be made.

4. In connection with each periodic report of the Corporation, review management's disclosure to the Committee required under §302 of the Sarbanes-Oxley Act with respect to the Corporation's disclosure and internal controls, and the content of the CEO and CFO certifications required by §302 and §906 of the Act.

5. Discuss with management the adequacy of the Corporation's significant reserves and provisions made in connection with the preparation of the Corporation's financial statements.

\* \* \*

11. Review the Corporation's programs for compliance with the financial disclosure requirements of applicable law.

12. Review with management, the chief internal audit executive and the independent auditor the Corporation's processes to maintain an adequate system of internal controls.

36.    Despite these additional duties, defendants Correnti, Harrison, Keyes, Klinger, and Williams wholly abdicated their responsibilities to the Company and its shareholders by allowing the Company to issue improper statements, and failing to ensure that reliable systems of controls were implemented and functioning effectively to prevent the Company from issuing improper statements.

## IV.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

37.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

38.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Navistar, regarding the Individual Defendants' management of Navistar's operations and the Company's unobtainable methods of purportedly achieving compliance with EPA guidelines in truck manufacturing; and (ii) enhance the Individual Defendants' executive and directorial positions at Navistar and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

39.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

40.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

41.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

42.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that

wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## V.   THE COMPANY FAILS TO COMPLY WITH EPA STANDARDS

43.    Navistar is a holding company that manufacturers International brand commercial and military trucks, IC Bus brand buses, MaxxForce brand diesel engines, Workhorse Custom Chassis brand chassis for motor homes and step vans, and Monaco RV, as well as a provides service parts for all makes of trucks and trailers.  In addition, it is a private-label designer and manufacturer of diesel engines for the pickup truck, van, and sports utility vehicle markets. It also provides retail, wholesale, and lease financing of trucks and parts.  Navistar offers its products and services through dealers and distributors primarily in the United States, Canada, Mexico, Brazil, Argentina, and India.

44.    Starting with the issuance of the new U.S. regulations in 2001, Navistar and its competitors were focused on developing engine technologies to meet strict EPA emission standards that were applicable for 2010 model year trucks and engines.  The two primary engine technologies that emerged were EGR, which reduced emissions by burning off exhaust pollutants within the engine (*i.e.* "in-cylinder"), and SCR, which reduced emissions by treating the engine exhaust with a urea-based chemical after it left the engine.  Despite the fact that EGR was the method preferred by customers, for convenience and cost factors, it quickly became clear that SCR was the only viable option to reach the strict EPA emission standards (specifically the 0.20g NOx).  In fact, every single one of Navistar's competitors (*i.e.* Mack, Volvo, Daimler, PACCAR, etc.) had adopted SCR and received EPA certification by 2010.

45.    Despite market-wide skepticism of the possibility of achieving 0.20g NOx with the EGR method, the Individual Defendants repeatedly claimed that Navistar could develop an EGR engine that would be certified by the EPA.  In fact, despite the $700 million Navistar had spent on developing its proprietary Advanced EGR engine, the Company did not even apply for EPA certification at the 0.20g NOx standard until sometime in the first quarter of 2011, almost a full year after the EPA standards had become effective.  Instead, to keep selling trucks and to

- 15 -

stay in business, Navistar began using EPA credits that it had previously earned. Once the credits ran out, the Company started paying a non-compliance fine for each truck it sold. After wasting hundreds of millions of dollars, the Company finally announced that it was giving up its decision to develop an Advanced EGR engine.

## VI.   THE INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING STATEMENTS

46.    For nearly two years, the Individual Defendants caused or permitted Navistar to mislead the public about its development of an Advanced EGR engine. On November 3, 2010, Navistar issued a press release announcing that the Company planned to submit for EPA certification at 0.2 NOx in the next few months. The release stated in part:

> Navistar also advised that it has submitted certification to the EPA for its MaxxForce 15 and plans to submit for EPA certification of its MaxxForce 13 at 0.2g NOx in the next few months, far ahead of when high volume production of the 0.2g NOx-certified MaxxForce 13 would be required.

47.    On November 3, 2010, Navistar held a held a press briefing at the Company's Engine Group facility in Huntsville, Alabama. Defendant Ustian and other executives were later quoted in various media articles falsely and unequivocally assuring the market that the Company had achieved EGR technology capable of meeting the 2010 EPA Standard of 0.2 NOx, and further assuring that the Company would submit those purportedly compliant EGR engines to the EPA for certification within the next few months.

48.    For example, on November 4, 2010 – Fleet Owner published an article entitled "Navistar says it has engines meeting 2010 emissions standard." The article highlighted defendant Ustain's false assurances, stating in relevant part:

> When Navistar announced it was going to meet the Environmental Protection Agency's 2010 emissions mandate with Advanced EGR technology, many said it couldn't be done. Some said Navistar could only satisfy the EPA 2010 emissions standard of 0.2 grams of nitrates of oxide (NOx) through the use of emissions credits that allowed its engines to emit 0.5 grams of NOx.
>
> According to Dan Ustian, president & CEO, Navistar not only can meet the 0.2 NOx level without credits, but customers are warming to its distinct engine solution.

"***We're 100% there in terms of our ability to do it***," Dan Ustian, chairman & CEO of Navistar said at a press briefing on Wednesday at the company's Engine Group facility in Huntsville, AL. "***It's really nothing to do with the technology anymore***, it's [customer] experience. They don't have any experience with the engine."

Ramin Younessi, group vice president-product development & strategy, told Fleet Owner that engines meeting the ***0.2 limit without credits will be submitted to EPA for certification "within the next few months***."

49.     Also on November 4, 2010, Today's Trucking published a similar article entitled

"Navistar: NOx-compliant engine achieved," which stated in part:

Navistar International says it is on the verge of submitting for certification a MaxxForce 13 engine that finally meets the EPA's 0.2g NOx standard, but it will continue selling engines that exceed that EPA limit until its banked emissions credits run out.

Navistar – the sole heavy-duty engine maker to go with an advanced version of the 2007 EGR system rather than SCR technology – announced it will for the first time submit to EPA 0.2g NOx-compliant engines, "***far ahead of when high volume production of the 0.2g NOx-certified MaxxForce 13 would be required***."

*   *   *

During the tour, Dan Ustian, chairman & CEO said the new generation, 0.2g NOx-compliant models improve on fuel economy. They will be submitted to the EPA in the next few months...

*   *   *

When asked for details before this posting, Navistar spokesman Roy Wiley would only confirm in an email that the "***0.2g NOx MaxxForce 13 we mentioned in the release yesterday and plan to submit to the EPA for certification will achieve emissions 'in-cylinder.'  Stay tuned***."

50.     The following day, on November 5, 2010, Truck News published an article

entitled "Navistar nearly ready to certify International MaxxForce at 0.2 g NOx."  As with the

two articles published the day before, the Truck News article confirmed defendant Ustain's

promise to certify the Company's engines at 0.2g NOx in the next few months.  The article stated

in part:

Navistar International will soon certify its heavy-duty engines at 0.2 g/hp-hr NOx but it will not roll those engines out to industry for as long as possible, until it has exhausted its collection of emissions credits.

During a recent tour of the company's Huntsville, Alabama big bore engine plant, Navistar chairman, president and *CEO Dan Ustian told media that the company will certify its engines at 0.2 g NOx so the industry has the peace of mind of knowing it is possible*.

"*Because of all the anxiety that is out there, we're going to certify that over the next few months here at 0.2 grams*," he said, adding the company will then continue selling engines at today's 0.5 g NOx level "as long as we can," so customers will not have to endure another engine change so soon. The 0.2 g NOx engine won't be drastically different from today's, Ustian noted, but will require new algorithms and enhancements to fuel pressure and air management systems.

\* \* \*

"There is this (perception) that when you go to 0.2, you're going to lose fuel economy," Ustian said. "We'll be able to show you that it's better fuel economy (at 0.2 g) just because of improvements in the technology."

51. On December 22, 2010, Navistar filed a Form 10-K with the SEC signed by defendants Ustian and Cederoth. The Form 10-K highlighted the Company's planned Advanced EGR engine development. The Form 10-K stated in relevant part:

**Our Strategy**

Our long term strategy is focused on three pillars:

I     Great Products

- Growing our product line, including an expanded line of our Class 8 ProStar® and LoneStar® trucks and Class 4/5 TerraStarTM trucks manufactured under the International brand, the AC series of small shuttle buses manufactured under the IC brand, and the Vesta RV manufactured under the Monaco brand

- Maintain strong market share in our "traditional" classes, including School bus Class 6 and 7 medium, and Class 8 severe service

- Focusing on engine research and development in order to have a *competitive advantage using Exhaust Gas Recirculation ("EGR") and other technologies for compliance with 2010 emissions standards*

- Introducing our advanced engine technology in new markets

52.     On December 22, 2010, after releasing its fourth fiscal quarter 2010 earnings results, Navistar hosted a conference call for analysts, media representatives, and investors. During the conference call, defendant Ustian again unequivocally stated that the Company had achieved 2010 EPA Standards with EGR technology, further boasting that no other company was able to achieve the same results.  Defendant Ustain stated in relevant part:

[USTIAN:]     Integration is a word that is tough to describe until you see it and we're going to be able to show you what integration means.  But I want to point out one thing, and this is kind of our culture. ***We're the only ones that meets emissions in the cylinder***. We're [the] only ones that all of our vehicles will have our own engine in it.  ***We're the only ones that have a full integrated product there and we'll show you why that's hard to copy. When you see it, I think you'll be impressed with how that'll be difficult for others to match what we've got there***.

* * *

[ANALYST:] ... Just a couple of clarifications. Dan, can you talk about the fuel efficiency of your 13-liter 0.2 NOx versus an equivalent SCR 0.2 NOx engine and if you – and if they're running close comparisons?

[USTIAN:] … We'll show you on the 25th, Ann, but - basically it's this. It gets better. It gets better because there are advanced technologies in the same area that we've worked on before. The fuel economy of the 0.2 will be better and there will be no change in heat rejection at the same time, so this product will be even better.

53.     On January 25, 2011, Navistar issued a press release announcing is earnings guidance for fiscal 2011.  The Company projected substantial gains in fiscal 2011 earnings due in part to the Company's implementation of its "three-pillar growth strategy and improving economic conditions."  The Company further reported it expected net income to be between $388 million and $466 million, or $5 to $6 diluted earnings per share ("EPS"), for the fiscal year ending October 31, 2011.  The release stated in part:

"As evidenced by our guidance, our strategy continues to drive value for our shareholders," said Daniel C. Ustian, Navistar chairman, president and chief executive officer.  "Coming out of the recession, we have developed today's earning guidance around a stronger economy, further expansion of our

aftermarket service parts business and continued benefit from great products, a competitive cost structure and profitable growth."

54.     On January 25, 2011, Navistar attended a Navistar International Analyst and Investor Day conference call for analysts, media representatives, and investors.   During the conference, defendant Ustian again touted the Company's supposed breakthroughs in EGR technology, stating in relevant part:

> [USTIAN:]     And what's the key ingredient?  Differentiation and leadership. Now some people hear the word differentiation and they hear risk. And our competition actually is how they try to create an aura risk by, EGR for instance. They say well, EGR is brand new technology and there's risk to it, you can't get fuel economy, it's going to heat up; the whole nine yards that's been out there.
>
> And then the other thing that they've done that's kind of interesting is they've used, after they realize that's in jeopardy here, they try other things, like how could all the companies be going one way and Navistar be going the other way? It must be Navistar is the problem. Well, they say, I've got European engineers. Everybody knows European engineers are smarter than the North American engineers.   *Well, the facts are now  out, our products are out there and they're delivering actually a little bit better than what we said on fuel economy, durability, the whole thing*…
>
> [JACK ALLEN – North American Truck Group:] … Few highlights.   The MaxxForce 7 is doing phenomenal.  We're seeing 9% better fuel economy than the prior model. *The MaxxForce 13, as I've said the fuel economy is at parity or better than anything in the market and we'll be applying for our 0.2 certification here in the next couple of months*.   The MaxxForce 15 is EPA-certified.   Someone asked me a question about that today. I assume that was widely known. MaxxForce 15 is fully certified with the EPA….

55.     On March 9, 2011, after releasing its first fiscal quarter 2011 earnings results, Navistar hosted a conference call for analysts, media representatives, and investors.  During the call, defendant Ustian scoffed at those skeptical of the Company's breakthrough technology and boasted that Navistar in fact already brought the new technology to the market.   Defendant Ustain further revealed for the first time that the Company had finally submitted its engine to the EPA for certification.  In relevant part, defendant Ustain stated:

> [USTIAN:]     Now let's talk about slide 22, and it's 0.2 emissions for 2010 and beyond. And we have two solutions....

*  *  *

- 20 -

Now let's talk about in-cylinder 0.2. One of our challenges, perhaps as difficult a challenge as the technology itself, was the marketing side of our solution, which is in-cylinder. *Since we were the only ones out there, there is a lot coming at us with oh, this can't work*

*And of course, now were out in the marketplace, and that's over. That argument's over. We're out there in the marketplace. We're exceeding what we had committed to in terms of performance and fuel economy and all that. So that's over*.

Well, we want to get in front of the 0.2 now, because we can anticipate – here's the next one coming out that 0.2 can't be done. *So what we did is we submitted to the EPA a certification of 0.2 to take that argument away*. We don't plan on using this for awhile, but we are going to have it out there on the shelf, that says it can be done, and we can meet the standards and get all of the performance features, as well.

So that's what we've done. When you hear about that, it's not that it's coming into production tomorrow. It's just to get it out there and take all of that argument away.

\* \* \*

[ANALYST:] A couple of things. First, Dan, on the 13-liter certification of 0.2, can you talk a little bit about what you did to the [engine]to get it in compliance at that level? Was there any after-treatment in there? Any other tweaks to the engine you can share?

[USTIAN:] Yeah. It's the same things. It's in fuel, air controls, cooling….

[ANALYST:] So it's all in-cylinder, there's no after-treatments?

[USTIAN:] No after-treatment, no.

\* \* \*

[ANALYST:] Okay. All right, great. And then one more little one. I think, Dan, at the beginning of the call it sounds like you said that the MaxxForce 13 was certified at 0.2, but it looks like you were just saying it was submitted for certification. Have you actually received certification?

[USTIAN:] No, no. We just submitted to the EPA. It takes a period of time – I don't know - two or three months before we will hear back from them likely. But, we're not in a hurry, *we just want to have it out there so we can take the argument away that it can't be done*.

- 21 -

56.    On April 5, 2011, Navistar issued a press release entitled "Navistar Receives EPA Certification for MaxxForce DT Mid-Range Diesel Engine At 0.39G NOx – With EPA and CARB Certification of MaxxForce® 15, Submission of MaxxForce® 13 at 0.2g NOx, Company Continues to Make Strides in its In-Cylinder Emissions Technology Path."  In the press release, defendant Ustain stated unequivocally that the Company had no intention to use the industry standard SCR technology because Navistar had purportedly achieved the 0.2g NOx standard through its breakthrough EGR technology.  The press release stated in part:

> MaxxForce 13 at 0.2g NOx Submitted to EPA
>
> In addition, Navistar also recently submitted its MaxxForce 13 at 0.20g NOx for EPA certification, once again reiterating its prime technology path in meeting the 0.20g NOx standard through in-cylinder technologies. The company intends to phase-in its engines at progressively lower NOx emissions levels (0.4g NOx, 0.35g NOx, 0.3g NOx, 0.25g NOx, etc.) in the years ahead in an effort to make emissions compliance as seamless as possible to its customers.
>
> "During the past several years, while other OEMs were producing engines at or above the required emissions standard, Navistar produced engines much cleaner than the standard, in turn, generating credits that today provide us with the flexibility needed to develop the most customer-focused emissions technologies in the industry," Younessi added. "Our MaxxForce Advanced EGR in-cylinder emissions technology remains the only solution in compliance with EPA standards at the turn of the key, without the need for after treatment and without customers having to find and fill liquid urea for their SCR systems."

57.    On June 7, 2011, Navistar issued a press release announcing its second quarter fiscal 2011 results.  The Company reported net income of $80 million, or $1.02 diluted EPS, and touted future growth prospects and continued strong results.  The release stated in part:

> "The second quarter results represent good earnings and strong cash flow from operations while building to deliver to our 2011 and beyond objectives," said Daniel C. Ustian, Navistar chairman, president and chief executive officer. "We continue to see increasing customer acceptance of all our engine and vehicle families, confirming we have the right strategy in place and that we will deliver full year results toward the higher side of our previous guidance.
>
> *   *   *
>
> "In the second quarter, our growth strategy continued to unfold as we introduced a number of products to the market place," said Ustian. "Our core business has seen

an increase in volume and our military and service parts continue to deliver strong results. We also delivered solid results while investing in our future and growing globally."

58.     After releasing its second quarter fiscal 2011 results on June 7, 2011, Navistar hosted a conference call for analysts, media representatives, and investors.  During the call, defendant Ustain stated that the Company was on track with manufacturing efficiencies and expected a second half of the year profitability of $100 million.  Defendant Ustian further unequivocally stated that the Company's EGR technology could achieve better results than competing SCR technology.  Defendant Ustian stated in relevant part:

[USTIAN:]     [A]nd of course, emissions and fuel economy is at the forefront of all of that.  And in the quarter you can see we were able to improve fuel economy while lowering our NOx, so, it went down – we're from 0.5 we went to 0.45, and then we went to 0.39.  We also launched a 15 liter that we have certification on. That happened in the second quarter.

* * *

When we did our analyst presentations in January we said that engine would have, the first half of the year would be about a breakeven and the second half of the year $100 million profitability, and we're on track to that…. The military revenues, $850 million in the first half and $1 billion in the second half on track to that.  The manufacturing efficiencies, we're on track to all of those.

* * *

[USTIAN:]     Henry, I think what we were trying to show from the charts that we talked about today is we'll be impacted by three things in the share in the second half.

First of all, it's the experience that our customers get from, to them, a new engine, the 13-liter, especially in heavy trucks.  That is number one. And that's probably the biggest factor is the experience of that 13-liter in our heavy trucks. And that is going along great....

* * *

Henry, one of the things we had in the past, EGR and – this is all gone.  ***We haven't heard any signs of – any even discussion on it, other than the benefits that we get from EGRs, lower weights, and not having to deal with urea.  But as far as any discussion on SCR versus EGR, those things were passed a long time ago***.

- 23 -

59.    On June 7, 2011, Navistar filed a Form 10-Q with the SEC signed by defendant Ustian.  The Form 10-Q highlighted Navistar's previously reported results and included a slide stating that the Company's Advanced EGR technology was already submitted to the EPA.  The Form 10-Q stated in relevant part:

> Advanced Exhaust Gas Recirculation ("EGR"), combined with other strategies, is our solution to meet ongoing emissions requirements. Advancements in EGR technology have resulted in reductions in emissions of nitrogen oxides ("NOx") from 1.2 or more grams per brake horsepower-hour through 2009 to 0.5 grams in 2010, to as low as 0.39 grams in 2011, with additional reductions in process. Our engines meet current EPA certification requirements because of emissions credits we earned from 2007 through 2009 via the early adoption of technologies that reduced NOx levels beyond what was then mandated. The rate of usage of these emissions credits is dependent upon a variety of factors, including sales, product mix and improvements in technologies. We continue to invest in our EGR technology, combined with other strategies, to meet current EPA emission requirements in North America and Euro IV emissions requirements in South America, as well as evaluate our emissions strategies on a platform-by-platform basis to achieve the best long-term solution for our customers in each of our vehicle applications. As a result of these strategies, we do not expect the rate of usage of emissions credits to have a material adverse effect on our business and believe that coupling EGR with other emission strategies will provide a significant competitive advantage over our competition's products.

> \*   \*   \*

> Slide Presentation:

> Slide 37: Q16: What is Navistar doing to meet the 0.20g NOx emissions when its credits are depleted?

> A:   Navistar remains committed to its strategy of providing solutions that let customers focus on their business, not emissions regulations. Solutions under development are multi-pronged and include our prime path of in-cylinder solutions along with application-specific solutions such as the Amminex metal ammine-based NOx reductant delivery system which Navistar announced in December 2009. ***We submitted an application for the 0.20g NOx 13L EGR engine to the EPA***.

60.    On August 10, 2011, Navistar hosted a Navistar International Corp at Jefferies & Co. Global Industrial and A&D Conference call for analysts, media representatives, and investors.  During the call, defendant Ustian boasted that the Company had taken a technology

path that was different than anyone in the world to achieve 0.2g NOx. Defendant Ustain stated in relevant part:

> [USTIAN:]    So now let's dissect Class 6 and 7, let's talk about what were the ingredients for us in that strategy. And on the Class 6 and 7 business, remember our strategy included taking a technology path that was different than anyone in the world, certainly in North America, but basically anyone in the world. And that technology path says that, we will answer emissions inside the cylinder without the need for after treatment. It helps our customer and obviously, our cost structure is a lot better from it as well.

> \* \* \*

> On Class 8, our strategy was threefold. Number one, that same technology path of delivering emissions inside the cylinder.

61.    On September 7, 2011, Navistar issued a press release announcing its third quarter fiscal 2011 results. The Company reported net income of $1.4 billion, or $18.24 diluted EPS for the period ended July 31, 2011, and defendant Ustain predicted a strong fourth quarter and strong future growth prospects. The release stated in part:

> "The industry continued its recovery in the third quarter, and our results reflect this strengthening as well as our continued investments for future growth. We introduced new products for our growing global presence, invested in our engineering integration and heavy engine strategies, and took additional actions to reduce costs and further increase our manufacturing flexibility," said Daniel C. Ustian, Navistar chairman, president and chief executive officer. "As a result, we are well positioned to deliver a strong fourth quarter, achieve our adjusted full-year earnings of $5 to $6 per share, and enter 2012 with positive momentum."

> \* \* \*

> "Our proven ability to deliver consistent earnings, even in the toughest of times, coupled with our future growth prospects gives us the confidence that we can capture the benefits of these deferred tax assets. As a result, Navistar is now in its best equity position in the last ten years," said Ustian. "Given our strong cash position, we are launching a significant buyback of our stock, which we believe is currently undervalued. We are also evaluating additional return on capital options and look forward to announcing them early in 2012."

62.    After releasing its third quarter fiscal 2011 results on September 7, 2011, Navistar hosted a conference call for analysts, media representatives, and investors. During the call,

defendant Cederoth touted that Navistar's ERG technology was "on par with the best SCR competitors." Defendant Cederoth stated in pertinent part:

[CEDEROTH:] As we move forward, we believe we have adequate cash to support the continued investment in our strategy and expand that strategy to markets such as China and our Global Truck products.

As we move forward and outline our plans for 2012, we will continue to develop our strategy around capital so that we continue to invest in our business, but also incorporate the opportunity to return value to our shareholders.

* * *

Slide Presentation:

Slide 48: Q16: *What is Navistar doing to meet the 0.20g NOx emissions when its credits are depleted*?

A: Navistar remains committed to its strategy of providing solutions that let customers focus on their business, not emissions regulations. Our primary path continues to be Advanced EGR. *This technology is proving extremely viable providing fuel economy and performance on par with the best SCR competitors*. Customer acceptance is excellent with over 60,000 vehicles built at 0.5 grams NOx or better. *As we develop 0.20g NOx capability our goal of continuing to improve performance and fuel economy at this emissions level is being realized*.

63.     On September 7, 2011, Navistar filed a Form 10-Q with the SEC signed by defendant Ustian. The Form 10-Q included Navistar's previously reported results and stated in relevant part:

Advanced Exhaust Gas Recirculation ("EGR"), combined with other strategies, is our solution to meet ongoing emissions requirements. Advancements in EGR technology have resulted in reductions in emissions of nitrogen oxides ("NOx") from 1.2 or more grams per brake horsepower-hour through 2009 to 0.5 grams in 2010, to as low as 0.39 grams in 2011, with additional reductions in process. *Our engines meet current EPA certification requirements because of emissions credits we earned from 2007 through 2009 via the early adoption of technologies that reduced NOx levels beyond what was then mandated*. The rate of usage of these emissions credits is dependent upon a variety of factors, including sales, product mix and improvements in technologies. We continue to invest in our EGR technology, combined with other strategies, to meet current EPA emission requirements in North America and Euro IV emissions requirements in South America, as well as evaluate our emissions strategies on a platform-by-platform basis to achieve the best long-term solution for our customers in each of our vehicle applications. As a result of these strategies, and other legal and regulatory courses of action available to us, we do not expect the rate of usage of emissions credits to have a material adverse

- 26 -

effect on our business. We believe that coupling EGR with our other emission strategies will ***provide a significant competitive advantage over our competition's products***.

64. On October 31, 2011, Navistar attended a Navistar International Corp at Gabelli & Company, Inc. Automotive Aftermarket Symposium conference call. During the call, defendant Ustain again stated that Navistar was the only company that could satisfy EPA regulations using ERG technology. Defendant Ustain stated in relevant part:

> ***We're the only ones that are able to do, satisfy the emissions regulations inside the cylinder***. And we use the same thing, the same tools that are in diesel engine manufacturing, and that is better combustion, better fuel, and air match with an electronic control system that allows those to provide the cleanest burn….

65. On December 20, 2011, Navistar issued a press release announcing its fourth quarter fiscal 2011 and full year 2011 results. The Company reported net income of $255 million, or $3.48 diluted EPS for the fourth quarter ended October 31, 2011. Additionally, the Company reported net income for fiscal year 2011 was $1.7 billion, or $22.64 diluted EPS. The release stated in part:

> "We are pleased that we have finished the year strong and delivered solid fourth quarter results across all segments," said Daniel C. Ustian, Navistar chairman, president and chief executive officer. "Not only did we deliver on 2011 commitments, we continued to invest in our strategy and set the foundation for a strong 2012."
>
> \*   \*   \*
>
> "We expect the industry to continue its steady recovery," said Ustian. "We will continue to leverage our market leading North American businesses, invest in new products and expand further into global markets, while effectively controlling our costs."

66. After releasing its fourth quarter fiscal 2011 and full-year 2011 results on December 20, 2011, Navistar hosted a conference call for analysts, media representatives, and investors. During the call, defendant Ustain promised to show off the Company's supposed breakthrough ERG technology on February 2, 2012. Defendants Cederoth and Ustain stated in relevant part:

> [CEDEROTH:] We ended the year at just under $1.2 billion of cash and that's what we expected to be. Cash flow for the quarter was driven by strong EBITDA

performance offset by capital expenditures and share repurchases. As you can see, we completed $125 million of share repurchases within 2011. We expect to complete the remainder of our $175 million program in 2012.

Both the parent company and NFC completed significant refinancings within the fourth quarter. I think it is important to note that these deals have allowed us to expand our liquidity, lower our borrowing costs, and extend our maturities.

\* \* \*

Our next growth opportunity is our global business. In 2011, our global revenue exceeded $3 billion. When you step back and you look at the products that we have, the products we can develop, and then couple these products with the distribution points that we've added, you can see we're laying the ground work for a great business in the future….

[ANALYST:] [A]re you able to keep the savings that you have from the SCR approach or do you have to compete on a little bit of discounting? Or are you even getting a premium in some cases, because people want to go SCR rather than – or want to go rather - EGR rather than SCR?

[USTIAN:]    Yeah, well, here's our strategy on it. The price is the same. We compete against everyone that's out there on a product, not on a technology. So as long as our product performs as well or better, we can price it not based on cost, but based on vehicle and that's exactly what we have been able to do.

\* \* \*

[ANALYST:] … so just a question on the 13-liter and certification, just progress within that process and any communication between you and the EPA, and when we could potentially see any news on certification at two?

[USTIAN:]    *Yeah, so here's we're at on it. We're going to submit for certification to the EPA on out big bore engine family, mostly the 13-liter first.* This is how it has worked. If you go back into time - remember for those of you that aren't familiar with us, what we did is kind of a building block strategy on emissions, and our emission strategy is inside the cylinder. So what we did is keep the standards that earned credits, use the credits while we get the technologies maturing. We've also said that the first product that would utilize all of those credits up would be on our big bore engines and that's kind of where we're at.

*But we are prepared now with the advancements in our technology and the strides we've made to mature that 0.2 solution to be able to submit it to the EPA in the very short term. What we're going to do is on – we'll be able to show you all of that how on Analyst Day on February 1, and I think it will become clear to you how we're able to do that. But integration is a big part of it. Obviously*

- 28 -

*technology advancements in fuel, air and controls is what makes that work for us*.

67.     On December 20, 2011, Navistar filed a Form 10-K with the SEC signed by defendant Ustian.  The Form 10-K included Navistar's previously reported results, concealed recalls affecting tens of thousands of vehicles Navistar had sold, and boasted that the Company's supposed EGR technology breakthrough would meet both EPA and CARB certification requirements.  The Form 10-K stated in relevant part: "We plan to submit certification applications to both EPA and CARB in the near future. *We believe that our engines meet both agencies' certification requirements.*"

68.     On January 23, 2012, Land Line Magazine issued an article entitled: "Navistar running low on emissions credits but has a plan," which stated in part:

> Navistar engines produced for several models of heavy-duty trucks are only certified to meet federal emissions standards until late February. After that point, the truck builder will have run out of emissions credits unless it unveils a new engine that meets federal NOx standards.
>
> *Navistar says it has a plan and will be unveiling a new engine "very soon."*
>
> *   *   *
>
> The emissions credits issue affects Navistar big bore engines of 11, 13 and 15-liters, said Navistar Spokeswoman Karen Denning.
>
> "Navistar remains confident in our EGR strategy and will be submitting a .2 engine for certification very soon," Denning told *Land Line Magazine* Monday.

69.     On February 1, 2012, Navistar hosted an analyst and investor day conference call for analysts, media representatives, and investors.  During the call, defendants Cederoth and Ustain represented that the Navistar had achieved 0.2g NOx with the Company's ERG technology, and that they expected EPA certification soon.  They also boasted that they achieved the 0.2g NOx requirement with better performance than SCR systems and without the cost.  In relevant part, defendants Cederoth and Ustain specifically stated:

> [JACK ALLEN:] Well, let's talk about another one, because it's been my experience over the last few years that you really can't have much of a meeting at

- 29 -

Navistar without it gravitating into a discussion about engine emissions and where we're going.

And so as you've all read, over the last couple of weeks here, once again our competitors, they're taking their best shots at us over this and that's okay. If we didn't have them worried, they wouldn't be so vocal.

\* \* \*

... [A]nd then the third one, ***achieve 0.2 emissions and achieve it without external aftertreatment***. Without a doubt in our mind and I think that of the industry, our solution is the simplest. It is the most customer friendly a***nd we are providing equal or better performance than the SCR systems without any of the cost, without the maintenance or without the hassle of SCR***.

***So, on the - on our 0.2, as Dan said, we submitted that earlier this week. This is a production engine. This will have no degradation in performance***. We've been working back and forth with the EPA now for a number of months on this submission and you know it's a complicated process and it takes time. The EPA will evaluate our submission and we'll work back and forth with them. At the same time, we'll take the time to make sure that this engine and this calibration is ready for production.

So what do we do in the meantime? ***Well we have a clear path that we are going to be able to build this year and certify our engines in all 50 states, that's not under debate from our standpoint***.

\* \* \*

Our goal is to continue to demonstrate that we're a leader in this area. ***We are the only manufacturer in the world who is going to have a 0.2 gram NO engine, out of the engine, engine out alone. We will have lower N2O levels than any SCR engine***.

\* \* \*

[ANALYST:] … I wanted to ask A.J. about the guidance, the $5 to $5.75. You mentioned that there are a couple of issues that just came up, the brake problem and the EPA certification. Are both - any costs related to those two issues in your guidance?

[CEDEROTH:]         Let me take them one at a time - ***I don't expect any issues with the EPA certification, so yes that is built into what we forecasted***....

\* \* \*

[ANALYST:] … A couple of other questions on the engine. Can you give a sense of what the differences are between the current engine that's with the EPA

- 30 -

at 0.2 versus the one at 0.43 and can you just give us a sense of looking from the outside, why you let it get down to this level where you may be close to running out of credits and - start with those.

[USTAIN:] What's interesting about that and I hope those of you that had a chance to take a tour get a better appreciation for what controls do to products these days and the tighter we can make these controls and the faster we can make these controls and the integration of these controls gives us dials that enable us to fine tune the engine so that the match up during transitions of air and fuel gives us a better burn.

When we go out on the floor over there, our guys are going to show you how that happens but essentially there's no - change to that engine. It's all in the responsiveness of the control unit that is before that. And, as far as waiting so long I mean we have to develop those control, and this is just what it took to get us to that.

* * *

[ANALYST:] ... Dan, last year you set a market share goal and your market share stayed pretty low, and now you are certifying the point - new 0.2 engine. How is that going to affect your market share as you go forward? What are your customers saying? Are they beginning to [try] out the new vehicle longer and so what are you – what's the long-term prognosis for your market share?

[USTIAN:]  Well interesting – beginning to the simple answer to that is, it's going to be invisible to the customer. Obviously that is the best thing for us. We've launched – we have launched some new products over the past several months in the 15-liter area and now in the 13-liter area with the LoneStar that'll help us gain that market share back. But as far as the customer sees on 0.2, he will not know the difference. That's always been the plan and we're able to produce that now. Invisible, no impact on fuel economy, no impact on performance.

70.     On March 8, 2012, Navistar issued a press release announcing its first quarter fiscal 2012 results. The Company reported a loss of $153 million, or ($2.19) diluted EPS for the first quarter ended January 31, 2012. Nonetheless, the press release predicted strong 2012 profit performance. The release stated in part:

"We proactively addressed these product issues in a low usage period during the first quarter, which we believe will improve long-term customer satisfaction and reduce warranty costs," said Daniel C. Ustian, Navistar chairman, president and chief executive officer. "Strategically, we achieved a number of key milestones in the first quarter, including our submission of a 0.2 NOx engine for EPA

certification and the announcement of our development of a full range of natural gas truck offerings."

\* \* \*

"We remain confident in our ability to deliver strong 2012 profit performance and make continued progress toward our long-term growth goals," Ustian said. "We are already seeing accelerated synergies from our recent move into our new integrated product development center beyond the $60 million we originally estimated. We now believe this integration of our people will unlock up to $100 million in savings toward our bottom line in 2012."

71.     After releasing its first quarter fiscal 2012 results on March 8, 2012, Navistar hosted a conference call for analysts, media representatives, and investors during which defendant Ustain represented that the Company expected the EPA to certify the Company's new engine and that it would be in full production by June 2012. Defendant Ustain specifically stated in relevant part:

[ANALYST:] First, thanks for the clarification on the $25 million NCP hit. Dan, could you or AJ let us know how many months you are assuming the NCP payments continue for that $25 million hit?

[USTIAN:] Yeah. So, Andy, here's maybe a way to look at it, we've submitted for the 0.2 and that goes through a process and typically that's about three months, I think, is about the average of that so when we get the certification it will still take some time for us to get the production on that. So what we're doing right now is getting ready to go to production in that and it will be about June before we can get into production with that particular engine. So that kind of gives you a framework of where it would be *as to the preciseness of it, we can't tell you, but our objective is to be in production on that in June*.

\* \* \*

[ANALYST:] Can you talk a little about the impact of these higher warranties on residual values for your used trucks? And then secondly, could you talk a little bit about 15 liters 13 liter. You've only submitted a 13-liter for approval to the EPA. Does that mean you are giving up on the 15-liter and, we look at [your comments] the last couple months and it is gaining share – engine share suggesting that customers are still specifying 15-liter engines out there? Sorry for the lengthy questions but if you could just kind of hook the two of those together, I'd appreciate it.

[USTIAN:]     Sure. Hey, Ann, I'll ask Jack to answer those. Go ahead, Jack.

\* \* \*

[JACK ALLEN:] Regarding the submission, I guess was your second question, *we submitted the 13-liter. We're prepared to submit the 11 and 15, Ann. I'm not quite sure why you would jump to the conclusion we are abandoning it, but we are prepared to submit the 11 and 15* but it really doesn't make a lot of sense to do that till the EPA addresses that 13-liter. And we can work back and forth with them and then we'll follow on with the 11 and 15-liter.

72.     On March 8, 2012, Navistar filed a Form 10-Q with the SEC signed by defendant Ustian. The Form 10-Q included Navistar's previously reported results.

73.     On June 7, 2012, Navistar issued a press release announcing its second quarter fiscal 2012 results. The Company reported a loss of ($172) million, or ($2.50) diluted EPS for the second quarter ended April 30, 2012 and defendant Ustain suggested that losses due to speculation that the Company's engines would not achieve EPA certification was unfounded. The release stated in part:

"Certainly, our first half performance was unacceptable. It included a warranty reserve to repair early 2010 and 2011 vehicles," said Daniel C. Ustian, Navistar chairman, president and chief executive officer. "We were also affected by speculation surrounding our engine certification for our Class 8 engine, which is why we are working tirelessly with the U.S. EPA to get resolution."

\* \* \*

"Going forward, we've identified a path for delivering strong profits in the second half of 2012," Ustian said. "Historically, the second half is stronger across our businesses, and we expect to build on this with improved market share in North America, stronger global performance and further cost reductions across all operations. Additionally, we're making management and operational structure changes to align our organization in a more effective manner to drive these results."

\* \* \*

"I am confident that our new management structure will lead to greater planning and execution around our integration strategy, further enabling us to deliver enterprise-wide profitability, leverage assets more effectively, streamline decision making and bring renewed energy to our team," Ustian said.

74.     After releasing its second quarter fiscal 2012 results on June 7, 2012, Navistar hosted a conference call for analysts, media representatives and investors during which defendants represented the following:

[ANALYST:] [T]he question is we'll start with the EPA engine certification. You said in your Q that you resubmitted that I think in May. Do we have any idea, I guess, what's the difference between what you submitted in February and what you submitted in May? And what are your views on when and if this thing gets approved, and how much of that is built into your second half forecast which is just a massive sequential improvement?

[USTIAN:] Yeah, for sure, Steve. I think let's define what we did there. In working with the EPA, they asked us - there were some spots that they wanted us to modify. And so we did that. And we've been running tests on that to make sure they meet all the requirements, not just of the EPA but our own requirements on performance, et cetera. And so we resubmitted that back to them and we're in the process now of working with them on getting that certified. So, that is where that stands. Of course, it's hard for us since it's somewhat out of our control to tell you exactly the timing of any of that so. So, I hope you can appreciate that. But that's the process that we're in right now.

75.    On June 7, 2012, Navistar filed a Form 10-Q with the SEC signed by defendant Ustian.  The Form 10-Q included Navistar's previously reported results and implied that the Company's EGR technology was comparable to SCR technology in reducing NOx emissions, with the added bonus that it achieved the NOx reduction in a more environmentally friendly way. The 10-Q stated  in relevant part:

In order to meet the current on-highway heavy-duty diesel ("HDD") emission standards, HDD engines must be certified by the EPA for compliance with the 0.20g oxides of nitrogen ("NOx") standard, which also includes standards for on-board diagnostics. Advanced Exhaust Gas Recirculation ("EGR"), combined with other strategies, is our solution to meet the 0.20g NOx standard. ***Our approach with EGR has dramatically reduced our NOx emissions compared to the previous NOx standard and we believe it is an environmentally friendly approach compared to the liquid-based urea Selective Catalytic Reduction ("SCR") systems used by our competitors***. However, we have not yet been able to obtain 0.20g certification for any of our HDD engines. Currently, we are able to sell our trucks which incorporate HDD engines and sell our engines by using emission credits or paying non-conformance penalties ("NCPs").

## VII.    REASONS THE STATEMENTS WERE IMPROPER

76.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

- 34 -

(a)     Navistar's attempted methods to achieve compliance with EPA guidelines in truck manufacturing had failed and indeed never actually worked;

(b)     Navistar would be forced to revise its plan to meet guidelines, incurring enormous costs to the Company;

(c)     Navistar did not have any engines ready to meet 2010 EPA Standards;

(d)     Navistar's filings with the SEC contained incomplete and misleading disclosures, including statements about the costs of recalls and details of various debts; and

(e)     as a result of the foregoing, numerous representations concerning the Company's purported EGR engine breakthrough technologies were improper.

## VIII.  THE TRUTH EMERGES

77.     The truth behind the Company's business prospects and Individual Defendants' wrongdoing began to emerge on July 6, 2012, when Navistar shocked the market by disclosing that it was abandoning its Advanced EGR engine technology in favor of SCR (the process used by its rivals) in order to meet 2010 EPA emissions standards.  On that day, the Company issued a press release stating in part:

> Navistar International Corporation today announced that it will introduce its next generation clean engine solution – In-Cylinder Technology Plus (ICT+) – to meet 2010 U.S. Environmental Protection Agency (EPA) emissions regulations and position the company to meet greenhouse gas (GHG) rules in advance of 2014 and 2017 requirements. The ICT+ technology combines Navistar's advanced in-cylinder engine expertise with urea-based aftertreatment and is expected to be available beginning early 2013.

> *  *  *

> By incorporating an already proven and certified aftertreatment system, the company looks forward to seamlessly offering production-ready vehicles early next year. Furthermore, this approach is expected to provide a clear path to quickly achieving 2017 GHG standards.

78.     Less than a month later, on August 2, 2012, Navistar issued a press release entitled "Navistar Announces Actions Designed to Enhance Competitive Position, Drive Profitable Growth and Increase Shareholder Value," withdrawing its full-year fiscal 2012

guidance until releasing its third fiscal quarter 2012 results. Further, the Company disclosed receiving a formal letter of inquiry from the SEC involving an investigation of various accounting and disclosure matters dating back to November 2010 by the SEC.

79. Documentation from the EPA and a related D.C. Court of Appeals case that were made available in 2012 demonstrate that, in reality, despite repeated assurances by the Individual Defendants to the contrary, ***Navistar had never achieved an EPA-compliant 0.20g NOx EGR engine*** and had not even applied for EPA certification prior to January 31, 2012. Even then, Navistar's application covered just one of its six engine families and was riddled with critical problems that resulted in the EPA sending it back and eventually the Company withdrawing it altogether.

80. At a September 28, 2012 Company event, Jim Hebe, Navistar Senior Vice President, acknowledged: "We have got the right emissions strategy, finally. The public will see a more upfront approach from Navistar.... ***We're through with the B.S*** …. ***We've had enough of it the past three years***.

## IX. THE IMPROPER REPURCHASES

81. The Individual Defendants' improper statements caused the Company's stock to trade at artificially inflated levels. Despite knowing or recklessly disregarding the fact that the value of the Company was inflated, defendants Cederoth, Correnti, Hammes, Keyes, Williams, McChrystal, Harrison, Klinger, Obsborne, Clariond, Gulyas, and Ustian authorized and implemented a repurchase of Navistar's stock with Company money in December 2010 and September 2011.

82. In December 2010 through September 20011, defendants Cederoth, Correnti, Hammes, Keyes, Williams, McChrystal, Harrison, Klinger, Osborne, Clariond, Gulyas, and Ustian caused the Company to repurchase approximately 475,000 shares of its stock at an aggregate cost to the Company of nearly $25 million. The purchases of the Company's stock were at artificially inflated prices as a result of the improper statements, press releases, and filings with the SEC that failed to disclose material information regarding the Company's

inability to achieve 2010 EPA Standards with its line of Advanced EGR engines and overstated business prospects.

83.   In September 2011 through January 2012, defendants Cederoth, Correnti, Hammes, Keyes, Williams, McChrystal, Harrison, Klinger, Clariond, Gulyas, and Ustian caused the Company to repurchase approximately 4.5 million shares of its stock at an aggregate cost to the Company of more than $175 million. The purchases of the Company's stock were at artificially inflated prices as a result of the improper statements, press releases, and filings with the SEC that failed to disclose material information regarding the Company's inability to achieve 2010 EPA Standards with its line of Advanced EGR engines and overstated business prospects.

84.   Despite defendants Cederoth, Correnti, Hammes, Keyes, Williams, McChrystal, Harrison, Klinger, Obsborne, Clariond, Gulyas, and Ustian's knowledge of the true facts about the Company's inability to achieve EPA certification for its ERG engines, they did not halt the Company's purchases and continued to allow the Company to purchase shares at artificially inflated prices. Defendants Cederoth, Correnti, Hammes, Keyes, Williams, McChrystal, Harrison, Klinger, Obsborne, Clariond, Gulyas, and Ustian decision was not the product of a valid business judgment.

85.   Under defendants Cederoth, Correnti, Hammes, Keyes, Williams, McChrystal, Harrison, Klinger, Obsborne, Clariond, Gulyas, and Ustian's purview, the Company bought back its shares at a weighted average price of $40.16, which was nearly twice as high as Navistar's share price of approximately $21.44 per share when the truth about the Company's failed emissions technology was revealed. The following chart illustrates the average prices paid for the Company's common stock during the repurchase period:

| Date of Board Authorization Repurchase Program | Type of Program | Authorized Amount of Repurchase | Period | Repurchased Shares | Average Price Per Share | Weighted Average Calculation | Approximate Aggregate Cost | Source | File Date |
|---|---|---|---|---|---|---|---|---|---|
| December 2010 | Repurchase[1] | $25 million | | | | | | | |
| | | | Jan-11 | - | - | - | - | 10-Q | 3/9/2011 |
| | | | Feb-11 | - | - | - | - | 10-Q | 6/7/2011 |
| | | | Mar-11 | 8,000 | $63.99 | $0.10 | $511,934 | 10-Q | 6/7/2011 |
| | | | Apr-11 | 3,500 | $68.35 | $0.05 | $239,225 | 10-Q | 6/7/2011 |
| | | | May-11 | 12,000 | $66.88 | $0.16 | $802,560 | 10-Q | 9/7/2011 |
| | | | Jun-11 | 115,400 | $54.57 | $1.26 | $6,297,378 | 10-Q | 9/7/2011 |
| | | | Jul-11 | 64,000 | $53.59 | $0.69 | $3,429,760 | 10-Q | 9/7/2011 |
| | | | Aug-11 | 272,666 | $42.37 | $2.32 | $11,552,858 | 10-K | 12/20/2011 |
| | | | Sep-11 | 56,450 | $38.30 | $0.43 | $2,162,035 | 10-K | 12/20/2011 |
| September 2011 | Repurchase[2] | $175 million | | | | | | | |
| | | | Oct-11 | 2,542,609 | $39.33 | $20.08 | $100,000,812 | 10-K | 12/20/2011 |
| | | | Nov-11 | 134,000 | $36.20 | $0.97 | $4,850,800 | 10-Q | 3/8/2012 |
| | | | Dec-11 | 843,700 | $38.11 | $6.46 | $32,153,407 | 10-Q | 3/8/2012 |
| | | | Jan-12 | 927,900 | $40.95 | $7.63 | $37,997,505 | 10-Q | 3/8/2012 |
| **Total:** | | | | **4,980,225** | | **$40.16** | **$199,998,275** | | |

1. On December 14, 2010, Navistar's Board of Directors authorized a stock repurchase program which commenced on January 31, 2011 to acquire up to $25 million worth of Company common stock. The repurchase program expired on December 31, 2011
2. On September 7, 2011, a special committee of Navistar's Board of Directors authorized a stock repurchase program which commenced on October 6, 2011 to acquire up to $175 million worth of Company common stock. The repurchase program expired upon the completion of the repurchase of $175 million of the Company's common stock on January 31, 2012.

86.     The difference between the aggregate cost and the current value of the repurchases is approximately $93 million.

87.     Because the price of Navistar's shares was artificially inflated by way of the Individual Defendants' concealment and misrepresentations, the Company materially overpaid for its own stock.  The stock purchases falsely signaled to Navistar's shareholders and the public that the purchase of the Company's stock at those prices was the best use of Navistar's cash.  Thus, defendants Cederoth, Correnti, Hammes, Keyes, Williams, McChrystal, Harrison, Klinger, Obsborne, Clariond, Gulyas, and Ustian breached their fiduciary duties and committed corporate waste by causing Navistar to purchase $200 million of its own shares at artificially inflated prices.

## X.     DAMAGES TO COMPANY NAME

88.     As a result of the Individual Defendants' improprieties, Navistar disseminated improper, public statements concerning the Company's purported engineering milestone in achieving an EPA compliant EGR engine.  These improper statements have devastated Navistar's credibility as reflected by the Company's almost $3.6 billion, or 71%, market capitalization loss from the relevant period high.

89.      Further, as a direct and proximate result of the Individual Defendants' actions, Navistar has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     fines and penalties imposed as a result of the Company not being compliant with EPA regulations;

(b)     amounts wasted developing the failed EGR engine;

(c)     costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(d)     costs incurred from responding to the SEC investigation;

(e)     costs incurred from the repurchase of almost $200 million of the Company's own stock at artificially inflated prices; and

(f)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Navistar.

## XI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

90.    Plaintiff brings this action derivatively in the right and for the benefit of Navistar to redress injuries suffered, and to be suffered, by Navistar as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Navistar is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

91.    Plaintiff will adequately and fairly represent the interests of Navistar in enforcing and prosecuting its rights.

92.    Plaintiff was a shareholder of Navistar at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Navistar shareholder.

93.    The current Board of Navistar consists of ten individuals, including the Company's current CEO, Lewis B. Campbell ("Campbell"), and five defendants: Correnti, Hammes, Keyes, Williams, and McChrystal. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**A.    Demand Is Excused Because Defendants Correnti, Harrison, Keyes, William, and Klinger Face a Substantial Likelihood of Liability for Their Misconduct**

94.    Defendants Correnti, Harrison, Keyes, William, and Klinger, as members of the Audit Committee during the relevant period, reviewed and approved the improper statements and earnings guidance.  The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

95.    Defendants Correnti, Harrison, Keyes, William, and Klinger breached their fiduciary duty by causing the Company to repurchase approximately 4,980,225 shares of its stock at an aggregate cost to the Company of about $200 million.  The purchases of the Company's stock were at artificially inflated prices as a result of the improper statements, press releases, and filings with the SEC that failed to disclose material information regarding the Company's inability to achieve 2010 EPA Standards with its line of Advanced EGR engines and overstated business prospects.  The difference between the aggregate cost and the current value of the repurchases is approximately $93 million.

96.    The principal professional occupation of Campbell is his employment with Navistar, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.  Specifically, Campbell receives an annual salary of $500,000, which may increase at the Board's discretion, and also received 500,000 stock options from the Company that are immediately exercisable at almost $11.5 million ($22.98 per share) and are currently valued at about $18.4 million.  Campbell is also eligible to receive an annual incentive

bonus for 2013 of up to $1 million based upon attainment of performance goals established by the Board. Thus the Board has the authority to review and approve Campbell's base salary, bonus, and equity compensation. Any demand on Campbell would be futile because he is dependent upon the Board defendants implicated in the wrongdoing for his livelihood. He will not vote to initiate an action against defendants Correnti, Hammes, Keyes, Williams, and McChrystal, defendants who are not disinterested and/or independent and who exert influence over Campbell's compensation by virtue of their positions as members of the Board. This lack of independence renders Campbell incapable of impartially considering a demand to commence and vigorously prosecute this action.

97.     Moreover, the acts complained of constitute violations of the fiduciary duties owed by Navistar's officers and directors and these acts are incapable of ratification.

98.     Each of the defendant directors of Navistar authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein and thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

99.     Navistar has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Navistar any part of the damages Navistar suffered and will suffer thereby.

100.     If Navistar's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Navistar. However, the directors' and officers' liability insurance policies covering the

defendants in this case contain provisions that eliminate coverage for any action brought directly by Navistar against these defendants, known as the "insured versus insured exclusion." As a result, if these directors' were to cause Navistar to sue themselves or certain of the officers of Navistar, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance, then the current directors will not cause Navistar to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

101. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Navistar for any of the wrongdoing alleged by plaintiff herein.

## XII.  FIRST CAUSE OF ACTION

### Against the Individual Defendants for Breach of Fiduciary Duty

102. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103. The Individual Defendants owed and owe Navistar fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Navistar the highest obligation of good faith, fair dealing, loyalty, and due care.

104. The Individual Defendants, and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty. More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Navistar, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

105. The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration. The Officer

Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) Navistar's attempted methods to achieve compliance with EPA guidelines in truck manufacturing had failed and indeed never actually worked; (ii) Navistar would be forced to revise its plan to meet guidelines, incurring enormous costs to the Company; (iii) Navistar did not have any engines ready to meet 2010 EPA Standards; (iv) Navistar's filings with the SEC contained incomplete and misleading disclosures, including statements about the costs of recalls and details of various debts; and (v) as a result of the foregoing, numerous representations concerning the Company's purported EGR engine breakthrough technologies were improper. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

106. Director Defendants Cederoth, Correnti, Hammes, Keyes, Williams, McChrystal, Harrison, Klinger, Osborne, Clariond, Gulyas, and Ustian, as directors of the Company, owed Navistar the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly permitting the Company and the Individual Defendants to make false statements about the Company's business prospects and to repurchase nearly $200 million shares of Navistar stock at inflated prices. Defendants Cederoth, Correnti, Hammes, Keyes, Williams, McChrystal, Harrison, Klinger, Osborne, Clariond, Gulyas, and Ustian knew or were reckless in not knowing that: (i) Navistar's attempted methods to achieve compliance with EPA guidelines in truck manufacturing had failed and indeed never actually worked; (ii) Navistar would be forced to revise its plan to meet guidelines, incurring enormous costs to the Company; (iii) Navistar did not have any engines ready to meet 2010 EPA Standards; (iv) Navistar's filings with the SEC contained incomplete and misleading disclosures, including statements about the costs of recalls and details of various debts; and (v) as a result of the foregoing, numerous representations concerning the Company's purported EGR engine breakthrough technologies were improper. Accordingly, defendants Cederoth, Correnti, Hammes, Keyes, Williams, McChrystal, Harrison, Klinger, Osborne, Clariond, Gulyas, and Ustian breached their duty of loyalty to the Company.

107. The Audit Committee Defendants, Correnti, Keyes, Williams, Harrison, and Klinger, breached their fiduciary duty of loyalty by approving the statements described herein

which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and defendants Correnti, Keyes, Williams, Harrison, and Klinger failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

108.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Navistar has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

109.    Plaintiff, on behalf of Navistar, has no adequate remedy at law.

## XIII.   SECOND CAUSE OF ACTION

### Against the Individual Defendants for Waste of Corporate Assets

110.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111.    As a result of the Company's failure to produce engines capable of meeting 2010 EPA Standards despite repeated assurances that the engines were already performing at such standards, the Individual Defendants have caused Navistar to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

112.    As a result of defendants Cederoth, Correnti, Hammes, Keyes, Williams, McChrystal, Harrison, Klinger, Osborne, Clariond, Gulyas, and Ustian's decision to repurchase nearly $200 million shares of Navistar stock at inflated prices defendants Cederoth, Correnti, Hammes, Keyes, Williams, McChrystal, Harrison, Klinger, Osborne, Clariond, Gulyas, and Ustian have caused Navistar to waste approximately $93 million.

113.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

114.    Plaintiff, on behalf of Navistar, has no adequate remedy at law.

## XIV.  THIRD CAUSE OF ACTION

### Against the Individual Defendants for Unjust Enrichment

115.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Navistar.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Navistar.

117.     Plaintiff, as a shareholder and representative of Navistar, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

118.     Plaintiff, on behalf of Navistar, has no adequate remedy at law.

## XV.  PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Navistar, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.     Directing Navistar to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Navistar and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

(a)     creation of a Board-level committee charged with the oversight of the Company's compliance with environmental regulations;

(b)      a proposal to strengthen the Company's controls over financial reporting;

(c)      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(d)      a proposal to regulate the Board's future authorizations of stock repurchases;

(e)      a provision to permit the shareholders of Navistar to nominate at least three candidates for election to the Board; and

(f)      a proposal to strengthen Navistar's oversight of its disclosure procedures;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Navistar has an effective remedy;

D.      Awarding to Navistar restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants Ustain, Cederoth, and Correnti;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## XVI.  JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 20, 2013

LASKY & RIFKIND, LTD.

/s/ Norman Rifkind

NORMAN RIFKIND
AMELIA S. NEWTON
351 W. Hubbard Street, Suite 401
Chicago, IL 60654

Telephone: (312) 634-0057
Facsimile:  (312) 634-0059


ROBBINS ARROYO LLP
BRIAN J. ROBBINS
KEVIN A. SEELY
ASHLEY R. PALMER
600 B Street, Suite 1900
San Diego, CA 92101
Telephone:  (619) 525-3990
Facsimile:  (619) 525-3991

LAW OFFICES OF ALFRED G.
  YATES, JR.
Alfred G. Yates Jr.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219
Telephone: (412) 391-5164
Facsimile:  (412) 471-1033
yateslaw@aol.com

Attorneys for Plaintiff

<u>VERIFICATION</u>

I, James Gould, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Corporate Waste, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:_March , 20,2013

_____
JAMES GOULD